AO 91 (Rev. 11/11)  Criminal Complaint

<table>
<tr><td>LODGED<br>CLERK, U.S. DISTRICT COURT<br><br>5/20/2020<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY:____aab____ DEPUTY</td><td colspan="2"># UNITED STATES DISTRICT COURT<br>for the<br>Central District of California</td><td>FILED<br>CLERK, U.S. DISTRICT COURT<br><br>May 20, 2020<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY:____KC____ DEPUTY</td></tr>
</table>

# UNITED STATES DISTRICT COURT
for the
Central District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| PAUL HORTON SMITH, SR. | ) | 5:20-MJ-00269 AMENDED |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of     October 27, 2016     in the county of     Riverside     in the     Central     District of     California     , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
/s/
*Complainant's signature*

Paul Rex Warner, Special Agent, FBI
*Printed name and title*

Sworn and attested to via telephone
~~Sworn to before me and signed in my presence.~~

Date:     05/20/2020

_____
*Judge's signature*

City and state:     Riverside, California

Hon. Sheri Pym, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Paul Rex Warner, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.   I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and have been so employed since July 2004. I am currently assigned to the Riverside Resident Agency of the Los Angeles Division of the FBI. I am currently assigned to a squad that investigates white collar crime violations. In the course of my employment with the FBI, I have investigated a variety of white collar violations, including public corruption, bank fraud, money laundering, mortgage fraud, and mail and wire fraud. I have participated in numerous aspects of criminal investigations, including the interception of wire communications, physical surveillance, utilization of confidential informants, consensually monitored telephone conversations, the execution of search warrants, and the arrest of individuals wanted for white collar violations.

### II. PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of a criminal complaint and arrest warrant for PAUL HORTON SMITH SR. for a violation of 18 U.S.C. § 1343 (Wire Fraud) on or about October 27, 2016 as to victim K.B.

3.   In addition, this affidavit is made in support of an application for warrants to search: (1) PAUL HORTON SMITH SR.'s business office, Planning Services, Inc., located at 3637 Arlington Ave #A, Riverside, CA 92506 (the "SUBJECT PREMISES")

described in detail in Attachment A-1; (2) the vehicle of PAUL
HORTON SMITH SR., a red 2003 Mercedes C320, California License
Plate 6GKZ762 (the "SUBJECT VEHICLE"), described in detail in
Attachment A-2; and (3) the person of PAUL HORTON SMITH SR.,
described in detail in Attachment A-3, for evidence, contraband,
fruits, and instrumentalities of violations of 18 U.S.C. § 1343
(Wire Fraud); 18 U.S.C. § 1341 (Mail Fraud); and 18 U.S.C.
§ 1956 (Money Laundering), which are set forth in Attachment B.
Attachments A-1, A-2, A-3, and B are hereby incorporated by
reference.

4.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses. This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint and
warrants and does not purport to set forth all of my knowledge
of or investigation into this matter. Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and in part only.

5.   I am further familiar with the facts and circumstances
of this investigation through my personal participation in the
investigation as well as my review of:

a.   Oral and written reports about this investigation
into PAUL HORTON SMITH SR provided or prepared by the FBI, SEC,
California Department of Business Oversight, and the California
Department of Insurance; and

      b.   Recordings of investors and FBI undercover employees speaking with PAUL HORTON SMITH SR., interviews conducted with investors and clients of PAUL HORTON SMITH SR., as well as various financial records received during the course of the investigation.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

    6.   The FBI is conducting an investigation into financial fraud and elder abuse involving PAUL HORTON SMITH SR. ("SMITH"). Based on all of the evidence I have reviewed in connection with this investigation, I believe that SMITH is perpetrating a Ponzi scheme.

    7.   SMITH is the owner and operator of Northstar Communications, LLC ("Northstar"), Planning Services, Inc. ("Planning Services"), eGate LLC, and I.E. Tax LLC, all of which are located in the Riverside, California area. He advertises himself on his website as a Chartered Senior Financial Planner.

    8.   Based on my investigation, it appears that SMITH performs some legitimate financial and investment advisory services work on behalf of some clients. Not all of his work, however, is legitimate. I have identified approximately 75 clients who have apparently fallen prey to SMITH's Ponzi scheme since 2013. Most of these clients appear to be retirees and the elderly. Many victims have given SMITH several hundred thousand dollars, and at least one victim has given over $1 million. Several clients have told me that they have invested their entire retirement savings with SMITH. My review of bank records show that these victims have transferred SMITH's business

entities over $10 million since 2013. Based on my client interviews, there is evidence that this scheme goes back to the early 2000s.

9.   While the investigation is ongoing, I believe it is likely that these transfers were fraudulently obtained. Specifically, bank records show that the overwhelming majority of these client funds were deposited into non-interest bearing checking accounts that were in the name of Northstar. Rather than being used to fund any form of legitimate investment, or being transferred to another account in the name of the client, the bulk of these deposits appear to have remained in Northstar's checking account until they were used to repay other investors.

10.   Based on my training and experience, interviews with SMITH's clients, and review of bank account statements, I conclude that SMITH is operating a Ponzi scheme and that there is no legitimate investment purpose for the transactions discussed herein.

11.   One of SMITH's current employees has told me that SMITH is continuing to try to recruit new clients and investors. Based on my interviews with the employee, victims, and victim representatives, I know that victims have continued to recently contact SMITH asking where their money was. Based on the foregoing, I believe that SMITH's contact is ongoing and that the Ponzi scheme is still active.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

A.   **SMITH's Business Activities**

12.   SMITH is the owner and operator of Northstar, Planning Services, eGate LLC, and I.E. Tax LLC.[1] These businesses are all located in the Riverside area.

13.   According to its website, Planning Services offers estate planning, tax planning, investment advisory service, as well as other financial services.[2] SMITH advertises on his website that he is a Chartered Senior Financial Planner. SMITH holds free seminars via Planning Services at various locations around the Riverside area where he discusses estate planning, trust creation to protect assets, and other financial matters. These seminars are for business generation; attendees can make subsequent appointments with SMITH for a private consultation should they wish to do so.

14.   eGate, LLC is a registered investment advisor in the State of California.  According to the California Department of Business Oversight's website, an investment advisor in California is:

> any person who, for compensation, engages in the business
> of advising others, either directly or indirectly through
> publications or writings, as to the value of securities or
> as to the advisability of investing in, purchasing or
> selling securities, or who, for compensation and as a part

---

[1] I.E. Tax is registered as an LLC with the California Secretary of State as a tax preparation business. To date, I have found no evidence that I.E. Tax is involved in the Ponzi scheme discussed herein. I have included the reference to I.E. Tax in the interest of full disclosure to the court.

[2] <u>See</u> https://www.planningservicesinc.net/ (last visited May 13, 2020).

of a regular business, publishes analyses or reports concerning securities.[3]

According to Planning Service's website, SMITH is the Investment Advisor Representative with eGate, LLC. eGate, LLC is referenced on Planning Services' website.

15.   Northstar registered with the California Secretary of State on April 13, 2000. On October 9, 2015, Northstar filed a Form LLC-12 with the Secretary of State that disclosed that SMITH was its Manager and its type of business was "financial planning." On March 7, 2018, Northstar filed another Form LLC-12 with the Secretary of State disclosing SMITH as its Manager, but listing its business activity as "Marketing/PAC." I could find no mention of Northstar on Planning Services' website.

**B.    The Scheme**

16.   SMITH offers certain clients an investment referred to as "Northstar." Based on my communications with some of the investors, SMITH appears to liken this investment to a private annuity contract that is both safe and provides a generous rate of return.[4] In reality, however, Northstar appears to be nothing more than a Ponzi scheme.

---

[3] See https://dbo.ca.gov/state-licensed-investment-adviser/ (last visited May 13, 2020).

[4] An annuity is a contract between an individual and an insurance company that requires the insurer to make payments to the investor, either immediately or in the future. Investors buy an annuity by making either a single payment or a series of payments. Similarly, the payout may come either as one lump-sum payment or as a series of payments over time.  See https://www.investor.gov/introduction-investing/investing-basics/investment-products/insurance-products/annuities (last visited May 14, 2020).

17.   Based on my training and experience, I know that a Ponzi scheme can have different forms and iterations. In substance, a Ponzi scheme essentially involves a fraudster making some form of claim regarding how an investment contribution will be used, often advertised to be in a safe manner, but which will result in a generous rate of return to the investor. These representations induce initial victims to give money to the fraudster. Unbeknownst to these investors, however, is that there is no legitimate business venture. Any money that the fraudster subsequently returns to them is typically money that the fraudster obtained from new victims.

18.   During the course of my investigation, I have identified 75 individuals who made a total of over $10 million in payments since 2013 that were deposited into two Northstar checking accounts. I have personally interviewed roughly 20 of these clients, or those representing them or their estate. I have also reviewed written statements and complaints from roughly five more clients regarding their investments with SMITH and Northstar.

19.   Based on my interviews with clients, SMITH leads investors to believe that Northstar is an annuity-type of investment that is a safe alternative to the stock market. Nevertheless, SMITH provides guaranteed interest rates, which vary for different investors, and which are typically supposed to be paid out monthly. According to my interviews, SMITH provides monthly Northstar statements (though many have said these statements are given less frequently) to investors. I have

obtained and reviewed some of these statements. The individual Northstar account statements typically display a unique Northstar account number, and interest earned, along with any monies paid out in monthly distributions. It is my belief that these statements are completely fictitious.

20.  Based on my interviews, I know that SMITH used the mail to deliver advertisements for seminars in which he sought to recruit clients. It is my understanding that some of his victims first learned of SMITH from these mailings. I also know that SMITH sometimes used the mail to deliver clients' monthly statements. I also know of one victim who SMITH sent a check via a commercial interstate carrier.

21.  Each of the clients that I spoke with believed that SMITH reinvested their money somehow. The specifics, and understanding, of SMITH's claimed re-investment differed based on the client. All of the clients' understandings appear to be inaccurate in light of evidence collected as part of this investigation.

22.  As discussed herein, I have reviewed all of Northstar's banking records, to which I am aware, from the following banks and date ranges: all of Northstar's BBVA banking records since 2013, and all of Northstar's Provident banking records since 2015. Based on this review, I have found no evidence that Northstar holds individual accounts for each of its investors. Further, I have seen no indication that SMITH reinvests the money that he receives. He simply deposits the money into a non-interest bearing checking account. The money

typically remains there until it is transferred to, or on behalf of, other individuals who I believe are also victims.

     **C.    Bank Accounts Used in the Scheme**

     23.  From June 28, 2001 to September 17, 2018, Northstar had a checking account number ending -380 at Provident Bank (the "Provident Northstar Account").

     24.  From February 23, 2010 to present, Northstar had a checking account number ending -020 at BBVA (the "BBVA Northstar Account"). Based on my review of bank records, this account appears to be the one that SMITH is using to facilitate the bulk of his fraud.

     25.  From June 28, 2001 to September 17, 2018, Planning Services had a checking account number ending -330 at Provident Bank (the "Provident Planning Services Account").

     26.  From February 23, 2010 to present, Planning Services had a checking account number ending -7012 at BBVA (the "BBVA Planning Services Account").

     27.  From May 10, 2004 to February 29, 2020, eGate, LLC had a checking account number ending -4362 at Provident Bank (the "eGate Account").

     28.  During the course of this investigation, I have interviewed four people who have worked for SMITH and/or the business entities discussed herein. Each made clear that SMITH maintains personal control over the bank accounts, especially the accounts for Planning Services and Northstar.

**D.   Wire Fraud Allegation Contained Herein**

29.   On May 12, 2020, and again on May 14, 2020, I interviewed victim K.B., who is 70 years old. She has known SMITH since their mutual church association in the 1990's. After K.B.'s husband passed away in 2004, she consulted with SMITH on how best to consolidate her husband's investments and life insurance payment, which totaled $214,000. SMITH suggested that she invest the money into an annuity called Northstar. K.B. believed the Northstar annuity invested in utilities. When K.B. invested the $214,000 in Northstar in approximately 2004, SMITH provided her with a Private Annuity Contract which she signed. The contract guaranteed her a 6% annual interest rate with monthly payments. K.B. gave me copies of two "Contract Data Pages."[5] The first is dated November 9, 2004, and reflects assets delivered in the amount of $214,675.53, with a guaranteed interest rate of 5%. The second is dated November January 28, 2005, and reflects assets delivered in the amount of $126,161.69, with a guaranteed interest rate of 6%.

30.   Since her initial investment in Northstar in 2004, K.B. has moved several times, whereby she sold and purchased homes in different cities and states. K.B. told me that she used

--------

[5] Based on my client interviews, my understanding is that SMITH would give some clients documents entitled "Contract Data Pages." These documents typically contained the aggregate amount of the investment as well as the interest rate, amongst miscellaneous other information. SMITH would sometimes give clients a formal contract in addition to the Contract Data Pages, while some clients did not receive a formal contract. Based on my investigations, the Contract Data Pages did not reference Northstar whatsoever. One client has informed me that she never even received a Contract Data Page.

money from her Northstar account to purchase the homes, and then reinvested the proceeds back into Northstar when she sold a home.

31.  In August 2016, K.B. sold a home in Clarkdale, Arizona, and wrote a $175,000 check to NORTHSTAR on August 18, 2016. This check was deposited into the Provident Northstar Account.[6]

32.  Prior to this deposit, the Provident Northstar Account had $136,724.93 in it. SMITH immediately began paying prior investors with K.B.'s money, or making payments on their behalf. Specifically, SMITH wrote a $95,905.48 check to the IRS on behalf of Northstar investors J.G. and S.G., and a $26,527.32 check to the Franchise Tax Board, also on behalf of J.G. and S.G.. SMITH also made a $3,000 wire transfer on August 31, 2016, to G.S., whom I know to be a Northstar investor. There were also two checks to Planning Services for $10,000 and $5,000, which posted to the account on August 26, 2016 and August 31, 2016, respectively. SMITH continued to write checks and make transfers out of the Provident Northstar Account. Based on my review of the bank records, and my training and experience, I do not believe that these checks and transfers have any valid investment purpose on K.B.'s behalf. Based on my review of the bank records, the bulk of these transfers appear to be transfers to other investors.

---

[6] K.B. did not provide me with any Contract Data Page or contract regarding this investment.

33.   By October 2016, K.B. had relocated to Idaho Falls, Idaho. She was in the process of purchasing a home and requested that SMITH withdraw $125,000 from her Northstar account that she intended to use towards the purchase of a new home. K.B. was frustrated that it took SMITH well over a week to wire her the money because she was living with her family and pets in a hotel before the purchase could be completed.

34.   On October 27, 2016, SMITH made a wire transfer for $125,000 from the Provident Northstar Account to K.B.'s bank account in Arizona. On May 15, 2020, I spoke with a Supervisor at the home office of Provident Bank in Riverside, California, who informed me that Provident Bank is based in the Inland Empire of California, and has never had a branch in Arizona.[7] Further, according to Provident Bank's website, all of its branch offices appear to be located within the Central District of California.

35.   Based on my review of bank records, the Provident Northstar Account's highest balance during the month of October (before the October 27, 2016 $125,000 wire transfer to K.B.) was $98,359.83. Thus SMITH could not have complied with K.B.'s request for a $125,000 until he obtained money from elsewhere.

36.   Unbeknownst to K.B., the wire transfer that she received on October 27, 2016, was not a return of her money; it was money obtained from another victim. Specifically, T.F. made a $370,000 wire transfer to the Northstar Provident Account on

---

[7] Provident Bank is where the Provident Northstar Account and Provident Planning Services Account are located.

12

October 27, 2016. Prior to this credit, on October 27, 2016, the account had only $2,398.40 in it. As a result, it is clear to me that T.F.'s money was used to repay K.B.

    **E.   Other Victims**

       1.  <u>T.F.</u>

37.  T.F. is a 65-year-old widow who was introduced to SMITH by some of SMITH's other clients. Based on my review of documents related to a civil lawsuit against SMITH and bank records, I know the following:

    a.  T.F. sued SMITH alleging that SMITH said her money was going to be invested in an annuity in First National Bank and Trust Company. T.F. also alleged when she requested her funds back SMITH did not return them, even though the request was given within the 30 day cancellation window under the contract for the money to be returned.

    b.  SMITH told T.F. that she was investing her money in an annuity that had a guaranteed 5.1% annual interest rate, which was protected from the volatility of the stock market, but was yet tied to some type of index fund.

    c.  As stated above, prior to T.F.'s $370,000 wire transfer on October 27, 2016, the Northstar Provident Account had only $2,398.40 in it.  SMITH wired K.B. $125,000 on the same date as T.F.'s inbound wire. The following day, SMITH withdrew another $200,000 from the Provident Northstar Account to fund a cashier's check made payable to J.F. Within 48 hours of T.F.'s investment, SMITH withdrew $325,000 of T.F.'s $370,000

investment to repay other investors. Based on these transfers, I believe that J.F. is another victim of SMITH's scheme.

    d.    On October 26, 2018, SMITH gave deposition testimony in a civil lawsuit that involved T.F.'s investment. When asked, "... in March of 2017, where was [T.F.'s] investment of $370,000?" SMITH answered, "Still with Northstar." As discussed above, this statement was false.

38.    SMITH ultimately paid back T.F. However, just as he repaid K.B. with T.F.'S funds, he repaid T.F. with other investors' money.

39.    On July 30, 2017, the BBVA Northstar Account had a balance of less than $2,000. On July 31, 2017, two deposits posted into the account: (1) a $300,000 check from T.R. (whom I believe to be a Northstar investor); and (2) a $50,000 check from R.P. & G.P. (whom I know to be Northstar investors based on my interview with them on January 29, 2020). On August 4, 2017, a $17,000 check from R.D. & P.D. posted to the BBVA Northstar Account. I believe R.D. & P.D. are Northstar investors based on my review of banking records.

40.    On August 17, 2017, SMITH wired $336,382.50 out of the BBVA Northstar Account to the Provident Planning Services Account. On the same day, the Provident Planning Services Account bank records show that SMITH withdrew $336,382.50 to fund a cashier's check to T.F.

41.    Based on the foregoing, I believe that T.R., R.D. & P.D., and R.P. & G.P. are also victims of SMITH's fraud as their

money was funneled from the BBVA Northstar Account to the
Provident Planning Services Account, and then to T.F.

        2.   <u>J.C.</u>

42.  I interviewed J.C. on May 5, 2020. J.C's family has
had a long association with SMITH. J.C.'s father and mother, who
passed away in 2011 and 2013 respectively, invested with SMITH,
though not in Northstar, and were happy with SMITH's services.
J.C. met SMITH at his father's funeral. J.C. has three siblings
(and their spouses), along with at least two nephews, who have
invested in Northstar.

43.  J.C. retired from Allstate in April 2018 after over 30
years of work. J.C. had heard about Northstar from his brother,
R.C., who had already invested in Northstar. J.C. contacted
SMITH about investing in Northstar. SMITH met with J.C. for
lunch in May 2018, and J.C. gave him two cashier's checks
($252,178.37 and $307,506.75) that totaled $559,685.12. J.C.
told me this was the sum total of his retirement savings, and it
was all invested in Northstar.

44.  The two cashier's checks from J.C. posted to the BBVA
Northstar Account on May 22, 2018 and May 24, 2018 respectively.
Prior to the influx from J.C.'s money, the BBVA Northstar
Account had a balance of approximately $98,000. Over the span of
one month, SMITH spent all of J.C.'s money. SMITH used J.C.'s
money to fund a check for $325,000.00 that was payable to IRA
RESOURCES FBO H.M. Other expenditures included a check for
$95,907 to B.S., a prior Northstar investor who was demanding
payment, another $44,231.39 check to H.M., a $50,000 cashier's

check to G.A., and a $25,000 wire to R.P., who was also a
Northstar investor. By June 22, 2018, the BBVA Northstar Account
balance had diminished to $27,761.77.

>    3.   G.P. & R.P.

45.   I interviewed G.P. and R.P. on January 29, 2020. G.P.
and R.P. are retirees who are 69 and 70 years old, respectively.
A family friend, who had invested in Northstar, referred G.P.
and R.P. to SMITH. G.P. and R.P. met with SMITH and decided to
invest with him. In 2013, G.P. invested $60,000 from her
retirement account (she retired as a teacher earlier that year)
in a legitimate investment in American Equity. In 2017, when
R.P. sold his business, he invested $50,000 in Northstar. In
2018, R.P. and G.P. decided to liquidate their $50,000 Northstar
investment. On May 29, 2018, SMITH wired $25,000 to G.P. and
R.P. from the BBVA Northstar Account.[8]

46.   On June 29, 2018, G.P. and R.P. decided to re-invest
in Northstar and wired $400,000 into the BBVA Northstar Account.
Prior to this wire, the BBVA Northstar Account had a balance of
approximately $23,000. The same day, a BBVA cashier's check was
made out to A.P. for $280,682.13. Based on my investigation, I
assume that A.P. is a prior Northstar investor.

47.   BBVA Northstar Account bank records show that by
August 3, 2018, after paying disbursement checks to multiple
other Northstar investors, the BBVA Northstar Account had a

---

[8] On May 15, 2020, I interviewed G.P. regarding the $25,000
wire. She told me that she was not sure about when the other
$25,000 was given back to her and R.P. I subsequently reviewed
bank records and located a $50,000 check from BBVA Northstar
Account to R.P., which posted on April 22, 2019.

remaining balance of $460.93. In less than five weeks, G.P. and
R.P.'s $400,000 investment, which they believed had been
invested in safe securities, was gone.

        4.   <u>C.M.</u>

48.  I interviewed C.M, 64 years old, on March 18, 2020.
C.M. received a Planning Services advertisement in the mail in
2017. She and her late husband, S.M., attended a seminar put on
by SMITH in San Bernardino. During the seminar, SMITH discussed
the necessity of creating a trust to safeguard assets. C.M. and
her husband later had a private meeting with SMITH and decided
to utilize him to create a living trust. They made some
additional investments with him as well, but not in Northstar.

49.  C.M.'s husband, S.M., a retired U.S. Postal worker,
passed away in September 2018. SMITH thereafter came to C.M.'s
home to discuss S.M.'s life insurance payment. C.M. had trouble
receiving the payment, which was to be for $187,000.

50.  C.M. wanted to invest the insurance proceeds in
something safe. SMITH suggested she invest in Northstar, a safe
investment which guaranteed a 5% return. When C.M. questioned
SMITH about Northstar, he told her it was like investing in
Fidelity. C.M. was confused because she knew Fidelity did not
pay rates like that. SMITH told C.M. he worked for Northstar,
but never disclosed that it was his company.

51.  Notwithstanding her confusion, C.M. decided to make an
initial investment of $20,000 with Northstar. SMITH personally
came to her house to pick up the check, which was deposited into
the BBVA Northstar Account on November 29, 2018. Prior to this

deposit, the account had a balance of $585.25. Bank records show that C.M.'s $20,000 investment funded checks to prior investors and an attorney who creates trusts for SMITH's clients.

52.  After the $20,000 investment, C.M. had $130,000 that she wanted to use to pay off debt. SMITH told her that if she instead invested in Northstar she would earn enough from the monthly interest to pay off the debts in one year. C.M. subsequently made out a personal check for $130,000 to Northstar, which SMITH again personally picked up at her house. When SMITH deposited C.M.'s check on December 12, 2018, into the BBVA Northstar Account, it had a preexisting balance of $9,229.96. Based on my review of bank records, SMITH used some of C.M.'s $130,000 investment to pay individuals who I believe are prior investors. In addition, C.M.'s money was used to fund a cashier's check to J.P. for $74,143.40 on December 13, 2018. I interviewed J.P. on April 2, 2020. J.P. stated the $74,143.40 was the repayment of a loan (plus interest) that he had made to SMITH several months before. Based on my review of bank records, SMITH spent all of C.M.'s $130,000 investment in nine days.

53.  After investing with SMITH, C.M. asked about the lack of paperwork and he told her not to worry, and if she needed anything to call him. When C.M. pressed SMITH where exactly Northstar invested her money, SMITH said he would get back to her and provide her those details. He never did.

    5.  C.L.

54.  I interviewed C.L., who is 86 years old, on March 26, 2020, and March 30, 2020. C.L. told me that she has known SMITH

for many years and has utilized his services to invest
approximately $500,000 in financial instruments over the years
(none of which were in NORTHSTAR). In November 2019, C.L. sold a
rental property and invested $169,126.47 in Northstar at SMITH's
suggestion. C.L. told me that she felt like there was a degree
of safety because she was writing the check to Northstar, and
not directly to SMITH. When SMITH deposited C.L.'s check into
the BBVA Northstar Account on November 26, 2019, the preexisting
balance was $38.73. The following day, SMITH took $134,863.00
from the BBVA Northstar Account to pay S.W. Based on my review
of banking records and the investigation of this case, I believe
that S.W. is another victim of SMITH's scheme. Regardless, I am
aware of no valid annuity-type investment purpose that would
have permitted SMITH to transfer C.L.'s investment to another
individual.

6.   Additional Lawsuits

55.   It is my understanding from talking to victims or
their representations that SMITH has been sued on at least one
other occasion by investors related to this fraud.
Specifically, D.W., nephew of Northstar investors J.G. and the
late wife S.G., and now holds power of attorney for his 85 year
old uncle. D.W. filed a lawsuit on J.G.'s behalf against SMITH
in February 2020 for the return of the investment funds. SMITH
settled this suit in February 2020 and agreed to return $1.1
million through a structured payment plan. SMITH made a $80K
payment in February 2020, and is scheduled to make payments of

$200K every 60 days thereafter. My understanding is that the most recent payment is overdue.

**F.  Other Information**

56.  Planning Services is located at 3637 Arlington Ave #A, Riverside, CA 92506 (the SUBJECT PREMISES). I have personally seen the SUBJECT VEHICLE at the SUBJECT PREMISES within the last week. Further, I have spoken with one of SMITH's current employees during this investigation. On May 20, 2020, I spoke with this employee who confirmed that they currently work at the SUBJECT PREMISES for SMITH. They also told me that SMITH still operates Planning Services and Northstar out of the SUBJECT PREMISES.

57.  During the course of this investigation, I have also reviewed some of eGate, LLC's bank records. Based on this review, I have learned that on January 31, 2018, a BBVA cashier's check in the amount of $15,000, funded from the BBVA Northstar Account, was deposited into the eGate Account. Based on my investigation, I believe that all money in the BBVA Northstar account was fraudulently obtained funds.

58.  A current employee of SMITH told me on May 15, 2020, that SMITH speaks with Northstar clients on his cell phone almost daily. The same employee told me that sometimes the main office phone line is forwarded directly to SMITH's cell phone. The employee told me SMITH's cell phone number is (951) 990-8034.

59.  Based on my investigation, I know that SMITH's vehicle is a red 2003 Mercedes C320, California License Plate 6GKZ762

with VIN of WDBRF64J33F412859 (the SUBJECT VEHICLE). During the course of the investigation, I performed a records check and learned that the registered owner of the vehicle is "SMITH, PAUL H, 13234 Twinflower Ct, Moreno Valley, CA 92553." In February 2020, FBI agents conducted surveillance and took the photograph contained in Attachment A-2 when they saw SMITH using the vehicle. Finally, I spoke with one of SMITH's current employees on May 20, 2020, who told me that SMITH currently uses the SUBJECT VEHICLE and that he typically uses the SUBJECT VEHICLE when traveling to and from the SUBJECT PRESMISES and when he travels to meet with clients.

60.   Based on my training and experience, I know that white collar criminal often bring books, records, computers, phones, or other information pertaining to their fraudulent schemes in their vehicles.  These items are often carried when traveling between their homes, offices, banks, or meeting with clients. As discussed herein, SMITH would sometimes meet with clients in their homes or outside of his office. Thus I believe it is likely that he may have information related to his fraud within his vehicle.

## V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[9]

61.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[9] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the

---

paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    62.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

       a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so

23

many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

63.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after

24

a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

64.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress PAUL HORTON SMITH SR.'s thumb and/or fingers on the device(s); and (2) hold the device(s) in front of PAUL HORTON SMITH SR.'s face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

65.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

## VI.   CONCLUSION

66.   For all the reasons described above, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 1343 (Wire Fraud); and 1956 (Money Laundering); as described above and in Attachments B, will be found in a search of the SUBJECT PREMISES, in the SUBJECT VEHICLE, and on the person of PAUL HORTON SMITH SR., as further described above and in Attachments A-1, A-2, and A-3 of this affidavit, and that Paul Horton Smith Sr. committed a violation of 18 U.S.C. § 1343 (Wire Fraud) on or about October 27, 2016 as to victim K.B.

/s/

_____
Paul Rex Warner, Special Agent
Federal Bureau of
Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 20th day of May, 2020.

_____
UNITED STATES MAGISTRATE JUDGE

26

**ATTACHMENT A-1**

<u>PREMISES TO BE SEARCHED</u>

The premises to be searched is located at PLANNING SERVICES INC, 3637 Arlington Ave #A, Riverside, California (the "SUBJECT PREMISES").

The SUBJECT PREMISES is located in a two-story, multi-unit office building with cream color stucco exterior and orange tile roofing, built in the Spanish colonial style. The SUBJECT PREMISES is located in unit A on the south side of the first floor. The SUBJECT PREMISES has direct access to the parking lot on the east side of the building through the main entry. The main entry to the SUBJECT PREMISES, which is the only known entry/exit point into or out of the office, is a glass door with a PLANNING SERVICES INC sign and logo on the top half of the door. A photograph of the SUBJECT PREMISES is attached below.



## **ATTACHMENT A-2**

VEHICLE TO BE SEARCHED

The vehicle to be searched is a red 2003 Mercedes C320, California License Plate 6GKZ762 with VIN of WDBRF64J33F412859. The registered owner of the vehicle is SMITH, PAUL H, 13234 Twinflower Ct, Moreno Valley, CA 92553.



**ATTACHMENT A-3**

DESCRIPTION OF THE PERSON TO BE SEARCHED

    PAUL HORTON SMITH SR ("SMITH") is described as a white male, 56 years old with reddish grey hair, blue eyes and weighs approximately 200 pounds, and is 6'2". A photo of SMITH is attached below.



### ATTACHMENT B

### I. ITEMS TO BE SEIZED

1.  The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 1343 (Wire Fraud); and 1956 (Money Laundering) (collectively the "SUBJECT OFFENSES"), namely:

     a.    Records, materials, or documents containing or constituting bank statements, credit card statements, checks, deposit slips, check registers, applications, financial records, debit cards, credit cards, ATM receipts, and cryptocurrency records concerning the entities NORTHSTAR COMMUNICATIONS LLC, PLANNING SERVICES INC, EGATE LLC and PAUL HORTON SMITH SR. dated after January 1, 2010.

     b.    Documents concerning money transfers, Money Grams, Zelle transfers and/or transfer of funds using electronic means concerning, or for, the entities NORTHSTAR COMMUNICATIONS LLC, PLANNING SERVICES INC, EGATE LLC and PAUL HORTON SMITH SR. dated after January 1, 2010.

     c.    Documents reflecting the use of proceeds from the SUBJECT OFFENSES, including bank records, accounting records, real estate records, tax records, and items indicating travel, which includes passports, airline receipts, and border crossing documents, dated after January 1, 2010.

     d.    Records containing client files, telephone directories, phone logs, appointment books, calendars, diaries, notes, address books, and memoranda concerning NORTHSTAR

COMMUNICATIONS LLC, PLANNING SERVICES INC, EGATE LLC and PAUL
HORTON SMITH dated after January 1, 2010.

       e.  Documents reflecting tenancy and/or dominion and
control of the SUBJECT PREMISES and the SUBJECT VEHICLE, limited
to 15 items per location searched.

       f.  Any digital device' which is itself or which
contains evidence, contraband, fruits, or instrumentalities of
the Subject Offenses, and forensic copies thereof.

       g.  With respect to any digital device containing
evidence falling within the scope of the foregoing categories of
items to be seized:

       i.  evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,
browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

       ii.  evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

       iii. evidence of the attachment of other devices;

       iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

       v.  evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output

devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of

vii

the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.  If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.  If the search determines that a digital device does contain data falling within the list of items to be seized,

the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their support staff for their independent review.

6.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress PAUL HORTON SMITH SR.'s

thumb and/or fingers onto the fingerprint sensor of the device
(only when the device has such a sensor), and direct which
specific finger(s) and/or thumb(s) shall be depressed; and
(2) hold the device in front of PAUL HORTON SMITH SR.'s face
with his or her eyes open to activate the facial-, iris-, or
retina-recognition feature, in order to gain access to the
contents of any such device.  In depressing a person's thumb or
finger onto a device and in holding a device in front of a
person's face, law enforcement may not use excessive force, as
defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically,
law enforcement may use no more than objectively reasonable
force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.